# IN THE COURT OF APPEALS OF IOWA

_____

No. 24-1727
Filed January 7, 2026

_____

**State of Iowa,**
Plaintiff–Appellee,
v.
**Austyn Richard Self,**
Defendant–Appellant.

_____

Appeal from the Iowa District Court for Woodbury County,
The Honorable Zachary Hindman, Judge.

_____

**AFFIRMED**

_____

Jessica Donels of Parrish Kruidenier, L.L.P., Des Moines, attorney for
appellant.

Brenna Bird, Attorney General, and Nicholas E. Siefert, Assistant Attorney
General, attorneys for appellee.

_____

Considered without oral argument
by Tabor, C.J., and Greer and Buller, JJ.
Opinion by Tabor, C.J.

1

**TABOR, Chief Judge.**

Austyn Self admits shooting his girlfriend in the stomach, causing her death. Still, he challenges his conviction for first-degree murder on three grounds.[1] One, highlighting his intoxication defense, Self argues the State presented insufficient evidence that he pulled the trigger with malice aforethought and acted willfully, deliberately, and with a specific intent to kill her. Two, Self alleges the prosecutor engaged in misconduct. Three, he claims that newly discovered evidence—insights from his mother about his paranoia and strange behavior when drinking—requires a new trial.

Because the State presented strong evidence to support the mental elements of first-degree murder, we affirm the district court's finding of guilt. We also find no basis for a new trial.

## I.      The Shooting and Its Aftermath

*January 14, 2023. 9:41 p.m.*

"Stop, stop. Put the gun down. Put it down. . . . Stop. Stop, Austyn. You ruin everything. Don't point it at my kids. Stop. Stop." Moments before her boyfriend shot her, Sarah Zoelle—holding their seven-month-old baby—calls 911 for help.[2] Zoelle reports that her boyfriend keeps hitting her. Zoelle also tells the dispatcher that Self is threatening her with a handgun while his

---

[1] The district court also found Self guilty of three counts of child endangerment. He is not challenging those convictions on appeal.

[2] Meanwhile, Self is talking to his brother on another cell phone. When asked about the reason for that call, Self testified: "Maybe just to continue being angry, venting." Keegan recalled hearing a loud noise on the call but wasn't sure what it was.

two other children, ages three and five, look on.[3] The 911 recording then captures the crack of the gun firing. Zoelle screams: "I've been shot," repeating no less than ten times that she needs help.

When the dispatcher asks Zoelle, "are you still there with me?" she does not respond. Instead, a male voice comes on the line, admitting: "I shot her." Self tells the dispatcher that despite taking a bullet to the abdomen, Zoelle is still breathing. The dispatcher asks him why he shot her; Self says she was "fucking saying shit about me." Seeing the patrol units arriving at the house, Self tells the dispatcher that he put the gun down just inside the front door.

*January 14, 2023. 9:50 p.m.*

Self marches outside across his snow-covered yard, hands in the air, while two shirtless preschoolers peek out the front door. Body cam footage captures Sioux City police officers shouting mixed orders; they command Self to walk forward while urging the children to go back inside. Self seeks clarification before submitting to arrest. Officer MacKenzie Neely goes inside to find Zoelle lying on the couch with the baby on her chest. Zoelle has a gunshot wound to her abdomen, and her breathing is labored. Officer Neely comforts the crying baby and radios: "Send medical."

Paramedics find Zoelle alert but showing signs of shock—she is very pale, sweaty, and clammy. When she stops responding, they start CPR and rush her to the hospital. On the way, they get back her pulse and blood

---

[3] Self shared custody of his two older children with his former girlfriend. They were in Self's care the night of the shooting.

pressure with a dose of epinephrine. But she dies at the hospital, just before 10:30 p.m.[4]

*January 14, 2023. 10:14 p.m.*

After his arrest, police take Self to the station where he sits alone in an interview room. After about ten minutes, he opens the door and asks officers to loosen his handcuffs. They remove the cuffs and offer him water. He accepts the water, thanks the officers, and waits another half hour. During the wait he drinks water, uses a tissue from a box on the table, moves to a more comfortable chair, and flips through a phone book. Finally, he rolls the office chair across the room, opens the door, and asks the officers: "Why am I being detained?" The officers say they have already explained it to him and then repeat that it's because he shot somebody. A few minutes later, two detectives come into the room. Detective Paul Yaneff tells Self he is not free to go and begins to read the Miranda warnings. Self refuses to answer when the detective asks if he understands his rights. Instead, Self says: "I rather not say anything." The detective asks: "You don't want to talk to me at all?" Self replies: "Nope. I really don't." The detective probes, "Do you have a reason why?" Self replies, "Nope. You got to do your job." Detective Yaneff responds: "I'm trying to but I want to talk to you."

After a long pause, Self asks when he will get to make a phone call. The detective persists: "I need to know whether you're going to talk to me, yes or no?" The pair then banters back and forth—with Self insisting that he would like to make a call before deciding whether to talk with Yaneff. The detective agrees, and Self asks whether he can be alone while making the call. Detective

---

[4] Her autopsy showed that Zoelle sustained an "intermediate range" gunshot wound to her right abdomen. The nine-millimeter bullet injured her liver, intestines, and iliac vein. The medical examined determined that she died of blood loss.

Yaneff agrees to leave the room but refuses to turn off the camera and recording. The detectives supply Self with a cordless phone, and after a struggle to get an outside line,[5] Self connects with a family member for a two-minute phone call. Apparently not understanding the gravity of his situation, Self asks the relative to come pick him up, saying "I'm not under arrest, they just said that I'm being detained." Self adds that the police "really don't have shit" but have been "sitting outside my door, they're probably still sitting outside my door."

When Detective Yaneff returns, he clarifies that Self is indeed under arrest for a "domestic disturbance." The detective again starts to read the Miranda warnings but when he asks if Self understands his rights, the detective is met with silence. When pressed for a yes-or-no answer, Self says: "I'm not trying to be disrespectful, I'm just saying I'm invoking my Fifth Amendment." The detective tries again, and Self replies: "I'm not obligated to make sure that, like, I understand that for your sake. I'm just listening to what you're saying, that's it." The detective tries one more time: "For us to get into this conversation, I need you to understand your rights." Self retorts: "What conversation? I don't wish to get into a conversation, so how about that." The detective ends the session, putting Self back into handcuffs and leaving the room.

*January 14, 2023. 11:14 p.m.*

Forty-five minutes later, Detective Yaneff comes back into the interview room. He tells Self that he is being arrested for murder in the first degree because Zoelle passed away. The detective also asks to collect a buccal

---

[5] Detective Yaneff testified that as Self "went through numerous chances to dial a phone, he waved for help. I went in there for help. I even had problems with the phone, and I got the number through him and walked out."

swab from Self, telling him that police have a search warrant for the sample. Self refuses to cooperate, and the officers hold him down to swab inside his cheek.

*January 15, 2023.*

The next day, Self calls his brother from jail. Recognizing that the murder charge carries a life sentence, Self says the shooting wasn't "planned or on purpose" so maybe an attorney could get the charge reduced.

## II.   Trial Court Proceedings

In late January 2023, the State charged Self with first-degree murder and three counts of child endangerment. He waived both his ninety-day and one-year speedy trial guarantees. Self also waived his right to a jury trial. Before his May 2024 bench trial, Self gave notice of his intoxication defense. After a three-day trial, the district court issued findings of fact, conclusions of law, and a guilty verdict.

Self moved for a new trial, alleging three grounds: (1) the verdict was contrary to law and against the weight of the evidence, (2) the verdict was tainted by prosecutorial misconduct, and (3) there was newly discovered evidence. The district court denied his motion for new trial and sentenced him to life in prison without the possibility of parole. Self now appeals his conviction.

## III.   Legal Analysis

### A. Sufficiency of the Evidence

Self never denied shooting his girlfriend. Instead, he leaned on his intoxication defense.[6] Throughout trial, his attorney questioned witnesses about the concept of a "functioning alcoholic," which a police detective defined as "someone who is able to carry out everyday tasks in their life while having consumed a large amount of alcohol." Self fit that description, according to his stepfather's testimony: "[H]e was high functioning. He was always drinking." Self echoed that observation, testifying that he drank a fifth or more of vodka a day, which impacted his mental functioning. "I would make decisions that I normally wouldn't, perceive reality in a way that I normally didn't when I'm sober."

But the district court rejected Self's intoxication defense, finding the evidence showed "that despite his drinking, [he] was usually quite capable, not just physically, but also mentally." Focusing on the crime, the court said that although it had no doubt that Self "drank as much on the day of the shooting as he did most other days, the evidence established that [he] was quite clear-headed immediately after the shooting, which in turn proves that he was clear-headed at the time of the shooting." Self challenges those findings on appeal.

---

[6] Iowa Code section 701.5 (2024) sets forth an intoxication defense:

The fact that a person is under the influence of intoxicants or drugs neither excuses the person's act nor aggravates the person's guilt, but may be shown where it is relevant in proving the person's specific intent or recklessness at the time of the person's alleged criminal act or in proving any element of the public offense with which the person is charged.

We review sufficiency-of-the-evidence claims for correction of errors at law. *State v. Schooley*, 13 N.W.3d 608, 614 (Iowa 2024). In assessing Self's challenge, we view the evidence in the light most favorable to the State. *See State v. McFadden*, 320 N.W.2d 608, 614 (Iowa 1982). We consider all evidence, not just those facts supporting the verdict. *Id.* We will affirm if the verdict is supported by substantial evidence, meaning proof that could convince a rational trier of fact that Self is guilty beyond a reasonable doubt. *Id.*

Our first step is to review the basics of first-degree murder. The jury was instructed that the State had to prove these elements.

1. On or about January 14, 2023, Self shot Zoelle.

2. Zoelle died as a result of being shot.

3. Self acted with malice aforethought.

4. Self acted willfully, deliberately, premeditatedly, and with a specific intent to kill Zoelle.

*See* Iowa Code §§ 707.1, 707.2(1)(a).

Self contends that the State did not prove elements three and four, that he shot Zoelle out of malice and acted willfully, deliberately, premeditatedly, and with a specific intent to kill her. He first claims that "his action was an accident." He then argues that his intoxication supported convictions only for involuntary or voluntary manslaughter. In the alternative, he contends that a verdict of second-degree murder was the most severe consequence supported by the evidence.

His argument that his intoxication minimizes his culpability to involuntary or voluntary manslaughter is misplaced. While intoxication can neutralize the specific intent element, reducing a murder charge from first to

second degree, intoxication does not reduce a homicide from murder to manslaughter. *See State v. Hall,* 214 N.W.2d 205, 208–09 (Iowa 1974). So we only consider Self's intoxication defense in conjunction with the specific-intent element regarding his alternative argument. We begin with this alternative argument and then address involuntary and voluntary manslaughter as separate arguments from his intoxication defense.

To prevail on his intoxication defense, Self must show he was so intoxicated that he "could no longer reason and was incapable of forming a felonious intent." *See State v. Guerrero Cordero*, 861 N.W.2d 253, 259 (Iowa 2015), *abrogated on other grounds by Alcala v. Marriott Int'l, Inc.*, 880 N.W.2d 699 (Iowa 2016). When the accused invokes the intoxication defense, the State retains the burden of proving the element of specific intent. *State v. Templeton*, 258 N.W.2d 380, 383 (Iowa 1977).

Because the State rarely has direct proof of specific intent, circumstantial evidence often fills the void. *See State v. Hunt*, 801 N.W.2d 366, 376–77 (Iowa Ct. App. 2011). That circumstantial evidence can take various forms. *Id.* For instance, the type of injury can support an inference of intent. *Id.* The evidence showed that Self was just two to three feet from the victim when he fired a nine-millimeter bullet into her stomach, an area vulnerable to fatal injuries. *See State v. Gear*, No. 02-0071, 2003 WL 1524153, at *3 (Iowa Ct. App. Mar. 26, 2003) (stabbing victim in the torso supplied substantial evidence of specific intent to kill for attempted murder).

According to Self, his history of alcohol consumption left him unable to form murderous intent. He relies on his own testimony that he was a heavy daily drinker and began consuming alcohol as soon as he woke up, which made him paranoid and distorted his perception of reality. His family members corroborated his drinking problem. But as the district court noted

in its detailed factual findings, many officers who interacted with Self after the shooting "saw nothing suggesting [he] was under the influence of alcohol." Even on the 911 call seconds after the shooting, Self took responsibility for firing the gun, responded logically to the dispatcher's questions, recognized Zoelle's need for medical attention, and formed his plan to turn over his weapon and surrender.

And as the district court noted, Self's interactions with the officers who arrived at the scene of the shooting likewise prove how clear his mind was at that time. He asked a clarifying question about their competing commands for the children to stay back and for him to come forward and had no problem complying. Likewise, his conduct at the police station gave no hint of diminished mental capacity. For instance, he asked to make a phone call and was able to supply a relative's number from memory. And as the district court explained, Self "displayed a fairly sophisticated understanding" of his right to remain silent.

Further, Self's testimony supports the court's conclusion. He recalled the topics of his arguments with Zoelle that day. "At some point it went into just accusations of her cheating on me, my drinking problem, things about the kids, me not having a job. Just a lot of petty, minor things, I suppose." *See State v. Hicks*, No. 17-0130, 2018 WL 1433788, at *7 (Iowa Ct. App. Mar. 21, 2018) (finding sufficient evidence of specific intent because Hicks could "provide a detailed account of his actions" the day of the attack); *see also Guerrero Cordero*, 861 N.W.2d at 259 (resolving claims of intoxication is entrusted to the factfinder).

And there's a valid inference of intent to kill from Self's use of the firearm. "The use of a deadly weapon, if accompanied by an opportunity to deliberate, even for only a short time, is evidence from which a trier of fact

may find malice, deliberation, premeditation, and specific intent to kill." *State v. Jespersen*, 360 N.W.2d 804, 807 (Iowa 1985). The district court found that Self had ample opportunity to deliberate "consisting of the time between when he first pointed the gun and when he fired it, as demonstrated by the 911 call" to support his specific intent to kill Zoelle. We find no error in the application of law employed by the district court in finding Self acted with the specific intent to kill Zoelle.

The State also offered substantial evidence that Self acted with malice aforethought—the third element of murder. Iowa law defines "malice aforethought" as "a fixed purpose or design to do some physical harm to another that exists before the act is committed." *State v. Newell*, 710 N.W.2d 6, 21 (Iowa 2006) (citation omitted). As with the intent to kill, the factfinder "may infer the defendant acted with malice aforethought by using a dangerous weapon, the natural consequence of which is physical harm or death." *State v. Green*, 896 N.W.2d 770, 780 (Iowa 2017). And the district court could also infer Self's malice from the contentious nature of his relationship with Zoelle. A friend of the victim testified that Self was controlling and demeaned Zoelle. In that same vein, Self acknowledged on the witness stand that he argued with Zoelle for most of the day, pushed her after she allegedly punched him, and agreed that it was "the most heated argument" they'd ever had. We find ample evidence in the record to support the malice element of first-degree murder. Because the State produced sufficient evidence to prove elements three and four of first-degree murder, we reject Self's claim that the district court should have returned a verdict of involuntary manslaughter. *See* Iowa Code § 707.5.

Finally, Self fares no better on his voluntary-manslaughter argument. To be convicted of voluntary manslaughter, he must have acted "solely as the

result of sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a person." Iowa Code § 707.4(1). Even if the district court believed Self's testimony that Zoelle punched him, that action fell short of the serious provocation required for reducing the offense to voluntary manslaughter. *See State v. Thompson*, 836 N.W.2d 470, 478 (Iowa 2013) (finding slapping and obscene gestures insufficient to give voluntary-manslaughter instruction). Enough time had passed that Self could calm down; Self shot Zoelle while she was answering the dispatcher's questions about what he was wearing and what kind of car he might be driving if he left the house. Contrary to Self's contentions, the correct verdict was murder in the first degree.

## B. Prosecutorial Misconduct

In moving for a new trial, Self alleged that the prosecutor committed "prejudicial misconduct" by repeatedly commenting on his invocation of the right to remain silent. Self also asserted that the prosecutor provided "what appears to be the entire discovery file" to a sequestered witness.[7]

At a post-trial hearing, the district court ruled that Self's complaint came too late: "[Self] never raised any timely objection to any of the alleged impermissible conduct by the State. And Iowa law is clear, timely objections to improper statements by prosecutors, even improper statements relating to the right to remain silent, are required or those objections are waived . . . ."

---

[7] The witness at issue was Self's former girlfriend and the mother of his two older children. She testified at her deposition that she "ended up with a big stack of papers that was sent to me in the mail that had the kids' statements, all of the police statements, the police that were on duty that night that were at the incident . . . and even Sarah's autopsy." The prosecutor made a professional statement that he had "no idea" who sent that file to the witness but it did not come from his office.

As the court stressed, Self did not move to suppress evidence of his assertion of the right to remain silent nor did he object to admission of the video exhibit showing his interactions with Detective Yaneff. As for the discovery file, the court found that Self did not prove "that the information that the witness in question claims to have received actually came from the State."

On appeal, Self renews his claims of prosecutorial misconduct, alleging the district court abused its discretion in denying his motion for new trial. He also contends the State violated his constitutional rights in discussing his post-Miranda silence. On the discovery file, he argues that the sequestered witness's deposition was "colored by other people's recollections and reports." He claims that these actions violated his right to due process.

In response, the State embraces the district court's conclusion that Self failed to preserve error because he did not allege prosecutorial misconduct before his motion for new trial. "As the district court noted, Self did not lodge any timely objection, file any motion, or move for a mistrial based on the prosecutorial conduct he now alleges deprived him of a fair trial."

We agree that Self loses on error preservation. "[T]o preserve for review the issue of a fair trial because of misconduct of counsel 'it is the duty of the party aggrieved to timely voice an objection to give the trial court opportunity to rule on the matter since [that court] occupied a position of vantage and [its] conclusion is entitled to much weight.'" *State v. Plowman*, 386 N.W.2d 546, 550 (Iowa Ct. App. 1986) (quoting *State v. Dahlstrom,* 224 N.W.2d 443, 449 (Iowa 1974)). Self cannot seek a new trial without laying the groundwork for the alleged misconduct.

We also reject Self's claim that the prosecutor engaged in misconduct by providing a sequestered witness with the discovery file. "The initial requirement for a due process claim based on prosecutorial misconduct is proof of misconduct." *State v. Graves*, 668 N.W.2d 860, 869 (Iowa 2003). As the district court found, Self offered no evidence that the State was the source of the file, and the prosecutor denied mailing it to the witness. Without proof, there is no misconduct.

### C. Newly Discovered Evidence

Self also sought a new trial on the ground of newly discovered evidence. He alleged that following the verdict he learned that his mother had "relevant information that was never presented at trial." According to her affidavit, if called to testify, she "would have explained how her son grew paranoid and strange while drinking." And "she would have testified to [his] demeanor when drinking: how he seemed physically normal even as his mental state was deteriorating."

The district court may grant a new trial when "the defendant has discovered important and material evidence in the defendant's favor since the verdict that the defendant could not with reasonable diligence have discovered and produced at the trial." Iowa R. Crim. P. 2.24(2)(c). At the post-trial hearing, the court determined: "Where [Self's] motion on this issue comes up short is on the due diligence requirement." To satisfy due diligence, the accused "must exhaust the probable sources of information concerning his case; *he must use that of which he knows*, and *he must follow all clues* which would fairly advise a diligent man that something bearing on his litigation might be discovered or developed." *State v. Uranga*, 950 N.W.2d 239, 243 (Iowa 2020) (citation omitted).

As the district court found, Self did not follow all clues. The court described why Self did not meet the due-diligence test.

> [A] big part of his defense strategy was to present evidence from people who knew him, including members of his family, and who knew what effect his drinking had on him. And he was able to find several members of his family to come in and so testify. So even if he had no memory of certain specific conversations with his mother as he claims in his instant motion, he knew that people in his family knew about his drinking and knew about the effect of his drinking, and there's no reason that he wouldn't have known that his mother would have had that knowledge, just as did the witnesses whose testimony he did present.

We review the district court's ruling for an abuse of discretion. *Id.* An abuse occurs when the court exercises its discretion on unreasonable grounds or for untenable reasons. *Id.* After reviewing the record, we discern no abuse of discretion; the court gave sound reasons for denying Self's motion for new trial. Self contends he could not realistically discover his mother's insights because he was incarcerated before trial and the jail calls were recorded: "Self was therefore unlikely to discuss his defense strategy with his mother over the jail phones or to question her about elements of the crime." But that contention overlooks his other trial preparation. The defense procured testimony about Self's history of mental incapacity from alcohol abuse from two other family members, Self's brother and stepfather.[8] So due diligence would dictate that he could also reach out to his mother, who was a probable source for such information.

---

[8] While we don't address the materiality requirement, we question whether Self could overcome the State's argument that his mother's testimony would have been cumulative to that of other family members. *See State v. Smith*, 573 N.W.2d 14, 22 (Iowa 1997) (finding "little chance the alleged newly-discovered evidence would have changed the result of the trial").

## IV.    Summary

To recap, the State presented sufficient evidence to prove that Self committed murder in the first degree. The district court properly rejected his intoxication defense. The court also acted within its discretion when denying Self's motion for new trial.

**AFFIRMED.**