[Crim. No. 12105.   Second Dist., Div. One.   July 11, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. FRED M.
CLARK, Defendant and Appellant.

Caton J. Machamer, under appointment by the Court of
Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James,
Assistant Attorney General, and Rose-Marie Gruenwald, Dep-
uty Attorney General, for Plaintiff and Respondent.

LILLIE, J.—Defendant was indicted with two codefendants for the murder of Roberto Jordan (§ 187, Pen. Code) and the armed robbery of Robert Crosley (§ 211, Pen. Code); he was convicted of both crimes and the death penalty was imposed. Following an automatic appeal, the judgment as to defendant was reversed by the Supreme Court and the cause remanded for a new trial (*People* v. *Clark*, 62 Cal.2d 870 [44 Cal.Rptr. 784, 402 P.2d 856]). Tried to a jury, it again found defendant guilty of first degree murder and first degree robbery and that he had been armed at the time of the commission of both crimes. Following the penalty trial, the jury fixed the penalty at life imprisonment; the trial court sentenced defendant to life imprisonment on the first count and for the term prescribed by law on the second, the sentence to run concurrently with that imposed on the first count. Defendant appeals from the judgment.

Inasmuch as appellant raises no question relative to the penalty phase of the trial, we set up only the evidence offered on the issue of guilt. Around 10 a.m. on November 29, 1962 defendant went into a Safeway store, approached an employee named Cecil Houghton and stuck a gun in his stomach announcing that it was "a stick-up" and ordering him to "go to the safe." When he told defendant he was not the manager, defendant took him around the store until they found Robert Crosley. During this time he heard a click, the gun being cocked. With Crosley was the manager of the meat department, Thomas Geneway. As Crosley identified himself, defendant lifted the side of his trench coat (Exh. 3) and showed them his gun in a holster strapped to a gun belt (.22 caliber pistol [Exh. 2]). Told by defendant "This is a holdup. Let's go to the safe," Crosley turned to Geneway and said, "Let's go." Defendant marched the two men to the outside of the store where the safe was located against the wall. Crosley was very nervous but finally was able to open it. Defendant took a paper bag from the produce counter and ordered Crosley to put in it the money, consisting of bills and rolled coins. He then marched the men through a rear entrance back into the store; as they went through the swinging doors leading to the storage area, defendant pulled the gun out of his holster; Geneway heard a click, the hammer going back. Inside the store Roberto Jordan, a store employee, who took care of the dairy products, was standing in the front of the refrigerator; he was unloading frozen food from the freezer to a dolly. With gun in hand, defendant motioned to

him with it and ordered, "You come with us too," then shot him. Continuing their march, defendant ordered Crosley to open a locked door to a rear exit. Crosley was very nervous and couldn't find the right key; defendant ordered, "Hurry up and get this door open or I'll let you have it." Finally, Crosley found the key, opened the door and defendant left. Geneway and Crosley returned to Jordan who was lying on the floor wounded on the left side of the forehead; Jordan died from the gunshot wound which caused a tearing of brain matter.

Defendant fled the state. In December 1962 Kenneth Hill, a cab driver in St. Louis, Missouri, met defendant who was introduced to him as "Marcel" by a friend. Subsequent to January 21, 1963, defendant came to Hill's apartment; he was hurt. Defendant handed over to Hill a .22 pistol in a holster (Exh. 2) and told him he was wanted "out here," (meaning the west coast) and had killed a man "out here" and that was the gun he had used. An hour later defendant left. Later Hill, who was in no way connected with the police, turned the gun over to the St. Louis Police Department.

On the matter of guilt, defendant did not testify, and no defense was offered on his behalf.

On the theory that the killing of Jordan occurred during the commission and in the furtherance of the robbery of Crosley, appellant argues that the trial court could not impose sentence on the robbery conviction in addition to the sentence for murder. (§ 654, Pen. Code; *Neal* v. *State of California,* 55 Cal.2d 11 [9 Cal.Rptr. 607, 357 P.2d 839]; *People* v. *Logan,* 41 Cal.2d 279 [260 P.2d 20].) Appellant is in error. Section 654, Penal Code, which in pertinent part provides, "An act or omission which is made punishable in different ways by different provisions of this code may be punished under either of such provisions, but in no case can it be punished under more than one . . . ," does not here control. It is not applicable where one act has two results, each of which is an act of violence against the person of a separate individual. (*Neal* v. *State of California,* 55 Cal.2d 11, 20-21 [9 Cal.Rptr. 607, 357 P.2d 839]; *People* v. *Ridley,* 63 Cal.2d 671, 678 [47 Cal.Rptr. 796, 408 P.2d 124].)

In *Neal* v. *State of California,* 55 Cal.2d 11 [9 Cal.Rptr. 607, 357 P.2d 839], relied upon by appellant, defendant threw gasoline into the bedroom occupied by Mr. and Mrs. Raymond and ignited it; both were severely burned. He was convicted

of arson and two counts of attempted murder; sentences were imposed on all three counts, to run consecutively. The court stated, ''The conviction for both arson and attempted murder violated Penal Code, section 654, since the arson was merely incidental to the primary objective of killing Mr. and Mrs. Raymond. Petitioner, therefore, can only be punished for the more serious offense, which is attempted murder.

''The two attempted murder convictions, however, present a different problem. The purpose of the protection against multiple punishment is to insure that the defendant's punishment will be commensurate with his criminal liability. A defendant who commits an act of violence with the intent to harm more than one person or by a means likely to cause harm to several persons is more culpable than a defendant who harms only one person. For example, a defendant who chooses a means of murder that places a planeload of passengers in danger, or results in injury to many persons, is properly subject to greater punishment than a defendant who chooses a means that harms only a single person. This distinction between an act of violence against the person that violates more than one statute and such an act that harms more than one person is well settled. Section 654 is not '. . . applicable where . . . one act has two results each of which is an act of violence against the person of a separate individual.' (*People* v. *Brannon,* 70 Cal.App. 225, 235-236 [233 P. 88]; see also *People* v. *Major,* 65 Cal. 138, 146 [3 P. 597, 52 Am.Rep. 295]; *People* v. *Gaither,* 173 Cal.App.2d 662, 668 [343 P.2d 799]; *People* v. *Holman,* 72 Cal.App.2d 75, 100 [164 P.2d 297].) Thus, in *People* v. *Knowles, supra,* 35 Cal.2d 175, 187 [217 P.2d 1], the defendants kidnaped two persons for the purpose of robbing them. The robbery convictions were reversed by reason of Penal Code, section 654, but both kidnaping convictions were affirmed.

''The two consecutive attempted murder convictions were therefore properly imposed.'' (*Neal* v. *State of California,* 55 Cal.2d 11, 20-21 [9 Cal.Rptr. 607, 357 P.2d 839].)

*Neal* is relied upon by the court in *People* v. *Ridley,* 63 Cal.2d 671, 678 [47 Cal.Rptr. 796, 408 P.2d 124]; there it held that the assault on one Bennett with a deadly weapon with intent to commit murder (count III) was the means of perpetrating the robbery of Bennett (count I), thus both offenses were incident to the same objective, robbery, and defendant could be sentenced only for the robbery of Bennett, but that sentence imposed for assault with a deadly weapon with

intent to commit murder on one Watley was proper. The cause was reversed on other grounds but the court said, relative to the count charging the assault upon Watley, "Section 654 is not ' "applicable where . . . one act has two results each of which is an act of violence against the person of a separate individual." ' (*Neal* v. *State of California, supra,* 55 Cal.2d 11, 20-21; *People* v. *Zurica,* 225 Cal.App.2d 25, 32 [37 Cal. Rptr. 118].) As stated in *Neal,* the purpose of the protection against multiple punishment is to insure that the defendant's punishment will be commensurate with his criminal liability and a defendant who commits an act of violence with the intent to harm more than one person or by means likely to cause harm to several persons is more culpable than a defendant who harms only one person. Here the robbers in perpetrating the offenses in the pawnshop used deadly weapons and thus employed a means which was likely to, and which in fact did, harm more than one person. Sentence may therefore be imposed for the assault upon Watley as well as for the first degree robbery of Bennett if upon retrial Ridley is convicted of both of these offenses." (P. 678.)

In the instant case there were two victims—Roberto Jordan, who was murdered (count I), and Robert Crosley, who was robbed at the point of a gun (count II); also, there were two acts. The act of murder and the act of robbery constituted separate acts of violence against separate persons and constituted separate crimes, for each of which sentence was properly imposed.

In support of his claim that he was denied a fair trial, appellant briefly points to two instances of "laxity of counsel . . . indicative of inadequate representation," neither of which is subject to legitimate criticism.

First, he complains that his counsel, appointed by the trial court to represent him, should have objected to the introduction into evidence of the trench coat (Exh. 3) on the ground that "it does not appear that the search producing the coat was pursuant to a warrant." An examination of the record and authorities convinces us that the coat was properly admitted in evidence and that objection thereto would have been without merit and properly denied by the trial court. Cecil Houghton identified Exhibit 3 as looking like the kind of coat defendant had on when he came into the Safeway store; other witnesses testified that defendant was wearing a trench coat under which he displayed a gun. Officer Stevens testified that in the evening of December 3, 1962, after Crosley

and Geneway had identified police photographs of defendant as the person who robbed the former and killed Jordan, and in the course of his investigation, he went to a specified address where he saw two women, one who identified herself as defendant's mother, the other as defendant's sister. He talked with defendant's mother in the course of which he asked her permission to look in a particular area in the house (defendant's bedroom); she gave her permission and directed Officer Stevens to a rear bedroom. There he saw a raincoat (Exh. 3) which he took with him. Appellant makes no argument and cites no authority in support of his contention; he does not claim permission to search was not given by defendant's mother or that she had no right to give it or that the same was not voluntary—only that the officer had no warrant. Thus, inasmuch as the evidence established that defendant was wearing a similar coat when he came into the Safeway, and defendant's mother gave her permission to search that area of the house from which the coat was taken and actually directed the officer to defendant's bedroom where he found Exhibit 3, there was no valid basis upon which defense counsel could have objected to the coat's admission in evidence. Under the facts there was even no issue whether the consent was voluntary. Neither defendant nor his mother, who was present in the courtroom, testified to dispute it, leaving uncontradicted the testimony of Officer Stevens from which it can only be concluded that the consent to search was voluntarily given in response to reasonable inquiry. (*People* v. *Galle*, 153 Cal.App.2d 88, 90 [314 P.2d 58]; *People* v. *Salcido*, 154 Cal. App.2d 520, 522 [316 P.2d 639].) In *People* v. *Galle*, 153 Cal.App.2d 88 [314 P.2d 58], the court said that it was not unreasonable for officers without any show of force or coercion to call at a suspect's house in his absence, converse with his mother, state that they would like to search his bedroom, accept her permission to do so and go, upon her direction, to the area. It did not hold such entry, search and seizure to be unlawful. In *People* v. *Salcido*, 154 Cal.App.2d 520 [316 P.2d 639], officers were admitted by defendant's father who asked them to enter and directed them to the rear of the apartment where defendant was taking a "fix." "Those facts were sufficient to support the implied finding that the entry was not unlawful. (*People* v. *Gorg*, 45 Cal.2d 776, 782 [291 P.2d 469]; *People* v. *Michael*, 45 Cal.2d 751, 753 [290 P.2d 852]; *People* v. *Hood*, 149 Cal.App.2d 836, 838-839 [309 P.2d 135].)" (P. 522.) (See also *People* v. *Cahan*, 150 Cal.App.2d 786 [310

P.2d 661], in which officers were admitted by defendant's mother.) Even had the entry, search and seizure been unlawful, we perceive no prejudice to defendant in the admission of the trench coat. Offered on the issue of identity it added little or nothing to the evidence, for there was no real question concerning the identity of the man who robbed Crosley and murdered Jordan. Three eyewitnesses, Crosley, Geneway and Houghton, positively identified defendant as the man who entered the Safeway store and committed the crimes, and the witness Hill identified defendant as the person who confessed to him that he killed a man on the west coast with Exhibit 2.

Second, appellant complains that his counsel "should have moved the Court for a mis-trial when remarks concerning a confession" were made before the jury. In the previous trial admitted in evidence were two extrajudicial statements taken by police while defendant was under arrest; under *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361], the court held this to be reversible error. (*People* v. *Clark,* 62 Cal.2d 870, 880-881 [44 Cal.Rptr. 784, 402 P.2d 856].) Following the ruling, the People neither offered in evidence nor alluded to either statement. However, upon cross-examination of Geneway relative to his identification of defendant from police photographs on December 3, 1962, defense counsel asked him if defendant appeared any different today; Geneway answered yes—he now has glasses, a mustache and is a little heavier. Then the following took place: "Q. When did you for the first time learn that the name of the person who was in the store was Fred Clark, if you did? A. Well, I think it was after he was captured in St. Louis.

"Q. You don't know that that was the fact, do you? A. No.

"Q. Did somebody tell that to you? A. I heard that there was a confession and all that.

"MR. BUBRICK [defense counsel]: Please now.

"THE COURT: The jury will be ordered to disregard this last volunteered statement on the part of the witness.

"May I caution you, sir, to listen very carefully to the questions and just answer the questions. That one was rather vague.

"These are unfortunate situations, ladies and gentlemen, and when I caution you and urge you not to pay any atten-

tion to these statements it is important that you do so. I trust that you all understand that.''

Geneway's reference to a ''confession'' was volunteered, inadvertent and passing; immediately thereafter the judge instructed the jury to disregard it. But significant is the fact that for all the jury knew, the reference to a ''confession'' related to that made to Hill by defendant that he had killed a man ''out here,'' because Geneway volunteered the statement immediately after his reference to defendant's capture in St. Louis, Missouri. Kenneth Hill testified that in St. Louis, shortly after January 21, 1963, defendant who was hurt came to his home; he had a conversation with defendant who showed him a .22 caliber pistol (Exh. 2) which he handed over to him; and defendant told him that he was wanted out on the west coast, he had killed a man there and that was the gun he had used. Further, the evidence of guilt is so overwhelming it is inconceivable that Geneway's voluntary and inadvertent reference to a confession could have prejudiced defendant. In the light of the entire record, we are convinced that had motion been made for the judge to declare a mistrial the same would have been denied, and properly so. No legitimate criticism can be leveled against counsel for failing to make such a motion.

We have examined the oral proceedings in the lower court and other records here on appeal. We deem it wholly unnecessary to discuss any matter relative to whether counsel displayed the extreme lack of diligence or incompetence which must exist to reduce a trial to ''a farce or a sham.'' Mr. Bubrick, appointed counsel in the trial court, well and ably represented his client in the face of the clear and unequivocal evidence of his guilt; and had defendant not thought the same he most surely would have brought his complaint to the attention of the trial judge. Opportunity to do so was afforded defendant in a most considerate manner. Defendant not only failed to register any complaint (*People* v. *Monk,* 56 Cal.2d 288, 299 [14 Cal.Rptr. 633, 363 P.2d 865]) but told the court he felt he had a fair trial on both phases of the case. At the conclusion of the penalty phase of the trial, while the jury was deliberating, the trial judge in open court asked ''whether or not he [defendant] feels that he has had a fair hearing on this issue presented to the jury.'' His counsel stated, ''In my opinion, he has, your Honor.'' Then the following colloquy took place:

''THE COURT: How do you feel about it, Mr. Clark?

"The Defendant: Do you mean the trial in chief?

"The Court: Particularly this phase of the matter.

"The Defendant: The penalty trial?

"The Court: Yes. Do you think you have been treated fairly?

"The Defendant: Yes, to the best of my knowledge, I think so.

"The Court: How about the other phase, do you feel you had a fair trial on the matter?

"The Defendant: To the best of my knowledge, yes.

"The Court: I would like to observe for the record, in case there be any question at a later time, that I think Mr. Bubrick has done the very best for you that he could possibly do; he is a capable counsel, he has conducted himself, in my opinion, to the very best of his ability for your advantage and has taken every opportunity available to him to present the best that can be presented for you."

Appellant's indictment of Mr. Bubrick's representation of him is unfair and entirely unwarranted. Either we must impute to his present counsel a complete lack of good faith in raising any issue thereon or conclude that he is completely ignorant of the rules of law relating thereto or of what is contained in the record. When consideration is given to defendant's record and the cold blooded murder of Jordan committed for no apparent reason in the course of a strong-armed robbery with a loaded .22 pistol, which defendant was ready, willing, able to, and did, use, and which he continually cocked and uncocked "for a psychological effect," defendant was indeed fortunate that, in all probability because of Mr. Bubrick's efforts, the jury fixed the penalty at life imprisonment instead of death imposed at the first trial.

The judgment is affirmed.

Wood, P. J., and Fourt, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied October 5, 1967. Mosk, J., did not participate therein.