The appellant was indicted for the capital offense of robbery when the victim is intentionally killed in violation of Ala. Code § 13-11-2 (a)(2) (1975). In accordance with the principles stated in Beck v. State, 396 So.2d 645 (Ala. 1980), the jury found him guilty of first degree murder and fixed his punishment at life imprisonment in the state penitentiary. *Page 796 
The state's evidence revealed that the deceased, James Crawford Delones, a deputy sheriff with the Dickson County Sheriff's Department in Tennessee, left Dickson on July 10, 1979, headed for Decatur, Alabama, in his father's 1977 Plymouth Volare automobile. His father had also given him approximately forty or fifty dollars to take with him. The purpose of the trip to Decatur was to collect on a bad check. The deceased was off duty at the time and was not in uniform, but he did have two weapons with him, a nickel-plated .38 Colt Special and a nickel-plated .38 Derringer Special.
Steve Sanderson, while spraying a cotton field in the Harvest community in Madison County on July 14, discovered the deceased's body tied to a tree with a shoestring and a jumper cable. The tree was approximately one hundred yards off a dirt road leading into the cotton field.
The deceased's wallet was found in his pants pocket, complete with his I.D. and his deputy sheriff's badge, but the wallet contained no money. No weapons were discovered on the deceased or in the general vicinity. An autopsy revealed that the deceased's cause of death was a gunshot wound to the back of his head.
William H. Lee testified that at approximately 8:00 p.m. on July 10, while he was working at the Main Street Liquor Store in Nashville, Tennessee, he saw an automobile drive through the liquor store parking lot at a high rate of speed. The automobile "almost hit two people on the way driving in." The automobile matched the description of the Plymouth Volare the deceased had been driving, including a partial Tennessee license plate number Lee remembered. The driver of the car was a white male.
A few minutes later the same automobile came back through the parking lot, parked in front of the store and the white male came inside the store for a few minutes. Lee described the white male as having a small build, around five feet six inches tall, with brownish long hair. "He wore a thin mustache and was wearing a T-shirt, a tank top, some jeans and had some type of tattoo on his right shoulder." Lee further testified that the driver of the automobile who came inside the liquor store looked like the appellant. "I am positive enough that I think that's the same person."
Patrolman Charles Edwin Smith, Jr. of the Nashville Police Department testified that about 8:10 p.m. on July 10, he and his partner, James Powell Griffin, observed the Plymouth Volare which the deceased had been driving to Decatur, travel through a traffic light at a high rate of speed. Patrolman Smith stopped the vehicle near the police department.
 "I was watching the driver of the vehicle and he was looking in his rearview mirror back at me, as I was watching him and my partner got out and came between the two cars to issue a citation for the offense and the subject driving the car saw him and took off and left us more or less standing flat-footed."
Smith described the driver of the automobile as "a slim male, white, in his twenties, shoulder length brown hair, and a thin mustache."
A high speed chase ensued through downtown Nashville until the driver of the Volare lost control of the automobile and hit a fence. Smith testified that when he and his partner reached the vehicle the driver ran into the bushes and woods next to the railroad tracks. "He never did slow down." Smith and his partner "never could turn him up anywhere." Smith later discovered the deceased's .38 Derringer under the seat of the Volare along with a denim jacket and other items.
Roger Morrison of the Department of Forensic Sciences made a laboratory comparison of certain blood stains found on the denim jacket with a known sample of appellant's blood. Morrison determined that the appellant's blood type was consistent with blood found on the jacket.
Ms. Sandy Proffitt of Tompkinsville, Kentucky, testified that she had a conversation with appellant in Kentucky in July of 1979. Karen Jones was also present during the conversation. Appellant told Ms. Proffitt *Page 797 
and Ms. Jones that he had killed a deputy sheriff from Alabama. According to Ms. Proffitt:
 "He said that he killed him in Tennessee and he brought him all the way to Alabama when he was dead and then he tied him to a tree and then he said he shot him behind the ear and in the leg again.
. . . .
 "Well, he had a map and he was showing the place in Alabama and had a red dot and some lines where it happened at."
Carl John Buchanan testified that in May of 1980 he was a fellow inmate with appellant in the Madison County Jail. During this time appellant had a conversation with Buchanan in which appellant related killing the deceased. Buchanan testified that during the course of the conversation,
 "I was talking to him and everything and he told me he tied the man to the tree and that he did kill him because he don't like snitches and I don't like polices [sic] and the man is a narc and if I had my chances I would do it over and he said I tied him with a pair of jumper cables."
Richard Roscoe Ledford, III of Gallatin, Tennessee, testified that in July of 1979 he was employed with the Sumner County Rabies Control Center as a truckdriver for the dog pound, and that he also had a night job as an assistant manager at the Sonic Drive-in Restaurant in Gallatin. Ledford stated that he first met the appellant on July 11, 1979, around 8:00 p.m. at the Sonic Restaurant. Mary Shaddix, a waitress at the restaurant, was appellant's girlfriend. Ledford recalled that appellant had scratches "all over" his arms and "some on his chest." Appellant also had a tatoo with the name "Debbie" on his right arm.
Appellant remained at the restaurant until closing time, around eleven o'clock. At that time Ledford drove appellant and Ms. Shaddix to Ms. Shaddix's trailer at the Cozy Living Trailer Park in Gallatin. Inside the trailer, while everyone was "getting acquainted" over a six pack of beer, appellant exhibited the deceased's nickel-plated .38 caliber pistol to Ledford. Appellant had the pistol tied to his ankle with a shoelace. Ledford stated that he talked with appellant about the gun. "I asked him if he would like to sell it . . . and he told me that he would just give it to me . . . [because] it was hot. . . ." Appellant first explained to Ledford that "a friend of his" had held up a store with the pistol. Appellant later told another story that he and "his friend" robbed a store and in the process "his friend shot a guy in the back." Ledford offered to pay for the gun at a later time and took the gun home with him that night.
Before Ledford left the trailer that night, appellant asked Ms. Shaddix to wipe the scratches on his arms with alcohol. Appellant told Ledford the following regarding the scratches:
 "[H]e told me that he had stolen a car and had a car wreck [in Nashville] when the police chased him through three red lights and that he hit a fence row and the fence got him tied up where the car couldn't move and so he got out and started running through the bushes and that scratched him all up."
Ledford saw appellant the next afternoon at the Sonic Restaurant. Appellant expressed his desire to obtain a job and Ledford offered to take appellant with him the next day on his truck route for the Rabies Control Center to "see if he would like a job like that."
Ledford picked appellant up the next morning, July 13, at the Cozy Living Trailer Park and took him to breakfast before beginning the truck route. The following exchange then occurred during breakfast:
 "Q Okay, did you have a conversation with him there at Shoney's?
 "A Yes, I asked him about the gun again and he told me the story about shooting the detective.
"Q All right, and tell me exactly what he told you.
 "A He said that he was hitchhiking and he thought that he was in Birmingham or Athens in Alabama and he said that he was hitchhiking and a guy picked him up and they were riding along and the guy that was driving asked him to look in the *Page 798 
back seat in his brief case for some BC powder and so Terry said that he turned around and he opened the suitcase and he seen that gun in the suitcase and he asked him why he had the gun and he told him that he was a deputy, that he was a detective, said that he was a detective and he told me when he seen the gun he had to have it, he wanted that gun so he didn't get the BC powders and he turned around and he told him said you don't have any but I think that I have some in my bag and he reached down in his bag and pulled his gun out and pointed it at him and asked him said you know what this is don't you and he said that the guy started getting scared and told him that he could have anything that he wanted in the car just don't kill him and he told him, just said just be quiet you son-of-a-bitch and do what I tell you and so he told him where to turn off on a dirt road and they went down the dirt road and went over to a field and he made him get out of the car and he told me that he got jumper cables out of the back seat of the car and took his shoelaces and tied him to a tree and he said that the son-of-a-bitch was crying and begging for his life and he didn't have any mercy for him.
. . . .
"Q Go ahead and tell us what he told you happened.
 "A He said that he tied him to the tree and before he left he put the gun to the back of his head and he said he blew his fucking brains out.
"Q Were those Terry's exact words?
"A That was his words.
 "Q And ya'll were sitting at a table in Shoney's Restaurant?
"A Yes, sir.
 "Q What, if anything, did you say to him after he told you this story?
 "A I said you can't be for real, and he said yes, I blew this fucking pig away."
Ledford further testified that after work he and appellant took the pistol appellant had given him (the pistol appellant said he had taken from the deceased) to Nashville and sold it for fifty dollars.
Ledford stated that appellant remained in the Gallatin, Tennessee, area for approximately one week after he first met appellant on July 11. Ledford first learned about the death of the deceased, other than what appellant had told him, on television on July 20. On July 24 Ledford called the Gallatin police station and made a statement. "I told what I knew when I gave that statement."
Following Ledford's testimony the state rested its case. Appellant's motion to exclude the evidence was denied. The defense then rested its case without presenting any evidence.
 I
From the foregoing facts it is clear that the state proved beyond any reasonable doubt that appellant was guilty of first degree murder. Every element necessary to sustain the jury's verdict was satisfied. Harjo v. State, 395 So.2d 1104
(Ala.Cr.App.), cert. denied, 395 So.2d 1105 (Ala. 1981). In a prosecution for first degree murder, circumstantial evidence alone may be sufficient to prove the accused's commission of the offense. Dolvin v. State, 391 So.2d 133 (Ala. 1980); Hayesv. State, 395 So.2d 127 (Ala.Cr.App. 1980), cert. denied,395 So.2d 150 (Ala. 1981). Cumbo v. State, 368 So.2d 871
(Ala.Cr.App. 1978), cert. denied, 368 So.2d 877 (Ala. 1979).
Viewing the evidence in the light most favorable to the prosecution, as we are required to do, Cumbo, supra, we find the jury's verdict well supported. The credibility of witnesses is solely for the jury's consideration and cannot be examined by this court. Hayes, supra.
 II
Appellant contends that the trial court committed error in admitting into evidence the signed waiver of rights form which he executed on July 24, 1979, at the correctional facility in Glasgow, Kentucky, where he was being detained. We disagree. *Page 799 
It was shown that appellant freely and voluntarily signed the waiver of rights form after being properly advised of his constitutional rights under Miranda v. Arizona, 384 U.S. 436,86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Appellant was questioned concerning the details of the deceased's murder after executing the waiver and responded that he understood the questions being asked. However, to each question that was asked appellant responded by saying either "I don't know" or "I can't remember." The waiver of rights form was subsequently admitted without objection.
Objections to evidence cannot be raised for the first time on appeal. Brown v. State, 392 So.2d 1248 (Ala.Cr.App. 1980),cert. denied, 392 So.2d 1266 (Ala. 1981). Review on appeal is limited to matters on which rulings are invoked in the trial court. McGee v. State, 383 So.2d 881 (Ala.Cr.App.), cert.denied, 383 So.2d 884 (Ala. 1980). Objections to the introduction of evidence must be made at the time the evidence is offered. Shelton v. State, 384 So.2d 869 (Ala.Cr.App.),cert. denied, 384 So.2d 871 (Ala. 1980). Thus, we have nothing to review on this issue.
Furthermore, Investigator Roger L. Grubb gave comprehensive testimony regarding the entire contents of the waiver of rights form prior to the admission of the waiver. This testimony was received in the presence of the jury without objection. Thus, even if a timely objection had been interposed, the admission of the waiver would have been cumulative at most. Oatsvall v.State, 57 Ala. App. 240, 327 So.2d 735 (1975), cert. denied,295 Ala. 414, 327 So.2d 740 (1976).
 III
In response to questioning by defense counsel on cross-examination, William H. Lee testified that he "talked with someone from Kentucky" regarding the events he had witnessed in the Main Street Liquor Store in Nashville on the evening of July 10, 1979. On redirect examination the following exchange then occurred:
 "Q Bill, this guy that you talked to from Kentucky did he identify himself to you?
 "A Yes, he did. He was a public defender but I didn't remember his name right off, but he was a public defender.
 "Q And did he tell you who he was representing at that time?
 "A He may have mentioned the name but I don't remember. But he told me what it was connected with.
"Q What did he tell you it was connected with?
 "A It was about the killing of a deputy and a boy that had already been caught for rape and he was trying to keep in Kentucky and they wanted him in Alabama and this and that. And I explained to him — well, he thought maybe I had some type of charge against him or something, I guess — I don't know.
 "MR. BLANKENSHIP: Judge, at this time, we would make a motion outside the presence of the jury.
 "THE COURT: All right, ladies and gentlemen, if you will, please, go to the jury room.
. . . .
 MR. BLANKENSHIP: Judge, we had previously filed a motion in limine in this case, which the Court granted directing the District Attorney's office to have his witnesses to not refer to any crimes in the State of Kentucky and the statement made by Mr. Lee at this point in time is exactly a statement about a rape in Kentucky. It was hearsay testimony. It was not admissible and it involved the commission of another crime which we were concerned with from day one in this trial. It brings another crime before this jury and the District Attorney was fully aware that is what this was all about, prevention of those crimes which he has been charged with ____
 "THE COURT: Yes, sir, I understand the basis of your motion. Just make it, please.
"MR. BLANKENSHIP: We move for a mistrial.
 "THE COURT: Well, we will find out first of all if the jury can disregard the *Page 800 
information. If they can disregard the information have you cautioned your witnesses about this.
"MR. MORGAN: Yes, sir, we have."
When the jury returned to the courtroom the trial court gave them the following admonition:
 "THE COURT: Ladies and gentlemen, in answer to a question that was asked by Mr. Morgan, this witness said something about a public defender attempting to keep someone in Kentucky or something of that nature. There was another word mentioned and the word was `rape.' It is imperative if we continue in this trial that this jury disregard both of those statements. I am instructing the jury at this point to disregard the statements, but I must inquire of you whether or not you can and will accept and abide by that instruction if I give it to you."
The trial court then polled each juror individually in a very thorough manner to determine whether they would abide by the instructions. Each juror replied that he would disregard Lee's statement and would not let it affect his judgment in the case. The trial court then denied appellant's motion for mistrial.
The grant or denial of a motion for mistrial is a matter within the sound discretion of the trial court, which will only be disturbed upon a showing of manifest abuse. Durden v. State,394 So.2d 967 (Ala.Cr.App. 1980), cert. denied, 394 So.2d 977
(Ala. 1981). A motion for a mistrial implies a miscarriage of justice and should only be granted where it is clearly manifest that justice cannot be afforded. It specifies such fundamental error in a trial as to vitiate the result. The granting of a mistrial is an extreme measure and should not be granted where the prejudicial qualities of an improper remark can be eradicated by the action of the trial court. Dickey v. State,390 So.2d 1177 (Ala.Cr.App.), cert. denied, 390 So.2d 1178
(Ala. 1980).
Where the trial court instructs the jury to disregard an improper statement, carefully evaluates the effect of such a statement upon the jury by polling them individually, and determines the jury's impartiality in spite of the statement, any prejudicial error which might otherwise have occurred is cured. Perry v. State, 371 So.2d 969 (Ala.Cr.App.), cert.denied, 371 So.2d 971 (Ala. 1979); Williams v. State,369 So.2d 910 (Ala.Cr.App. 1979). The denial of mistrial in this case was proper.
 IV
No error resulted in the admission of Ms. Sandy Proffitt's testimony. Not one objection was raised to the state's direct examination of this witness, and appellant elected not to cross-examine her even though he had full opportunity to do so. For this reason alone we find no error.
For the reasons shown, the judgment of the Circuit Court is due to be affirmed.
AFFIRMED.
All the Judges concur.