The appellant, John Paul Scott, was convicted of arson in the second degree for the burning of his house and sentenced to ten years' imprisonment. The fire spread to two neighboring houses, for the burning of which he was also convicted of arson in the first degree and second degree, and sentenced to thirty years' and ten years' imprisonment, respectively, with all sentences running concurrently.
 I
After having spent the preceding seven days in jail, on July 6, 1982, eighteen year old Harry Olsen was arraigned on charges of theft of property and forgery. Bail totalled $3,000, which he could not afford. During a recess of court, Harry's mother was sitting in the hallway when she was approached by the appellant, whom she testified she had never seen before. He told her that he had helped parents before *Page 1169 
by getting their "children" out on bond. He was always paid back by the child's doing odd jobs for him. She testified the appellant told her to "just wait over here for a few minutes[,] he'd go around the corner and see what he could do." A few minutes later, "he come back around and he said he had gotten Harry off, that everything would be all right." After Harry's release several hours later, the appellant told the mother that he would take Harry home, that "he wanted to speak to him about some work that he had for him."
Harry also testified that the appellant was a total stranger. Nevertheless, Harry accompanied his benefactor in the latter's customized, red and black Ford pick-up truck. While enroute to the appellant's home, the appellant told Harry about having been recently released from the hospital, having been burned when his car burned:
 "He said he pulled down a dirt road and he pulled the hood up on his car and he poured gas on the motor and lit it on fire and give it enough time to where it could burn, and he poured gasoline on his arm to make it look as if the car had exploded."
The appellant explained to Harry that he had set fire to both the car and his arm so that he could file an insurance claim, which had already been done. Thereafter, the appellant began "telling me what he really wanted me to do to be able to pay him back for him getting me out of jail":
 "Q Now, at the time he got you out of jail and you were introduced to him, you understood you were going to have to do something for him to pay him back, didn't you?
 "A That's correct. But the intentions he give me [sic] was for me to do the kind of work that I'm familiary with, like painting, yard work on his house [sic].
 "Q So, after he had told you that he burned his car and himself for insurance purposes, what did he tell you that he really wanted you to do.
 "A He wanted me to burn his house to be able to pay him back.
"Q To burn his house?
"A Yes, that's correct.
"Q Not to paint it but to burn it.
"A Right.
"Q And did he tell you why he wanted you to burn it?
 "A For insurance `cause he said his insurance was fixing to be canceled out on the 15th of that month.
 "Q Now, did you discuss any of the details about how he wanted you to burn the house while you were on the way to his house?
 "A Yeah. He was basically filling me in about what I would say to his wife before we had got there to make it look as if I was a professional at this.
". . . .
"Q Had you ever done anything like this before?
"A Never.
 "Q But he wanted his wife to think that you were a professional arsonist?
"A Right.
 "Q Well, what did he tell you to do in order to appear to be a professional arsonist?
 "A Basically he wanted me to know the amount of the gas. That's about all I can recall.
". . . .
"Q What did he say about how he wanted it done?
 "A Well, he was telling me about how they would have the back door and basically everything for me and all I would have to do was just come and do what I was supposed to do my part [sic] and he would already have everything ready to make it [look] as if someone broke in like and stole half of his stuff and made [sic] it look as if it was, I guess, an enemy of his had done it."
After they arrived at the appellant's house and Harry was introduced to Mrs. Scott, the appellant and Mrs. Scott commenced explaining how the house would be set-up, as reflected in Harry's following testimony:
 "A Well, he was basically showing me around, showing that they would have *Page 1170 
everything like tore up, drawers open, showing me where the back door would be ajarred [sic] open and they would have the back swinging gate with two bricks in front of it where it would already be open to access for me to get into the back.
". . . .
 "A Well, we, she showed me in the one room where three pieces of carpet would have to be laid down on the floor because in that one room it was brick, and they showed me where the three pieces of carpet would be laying and they would have some magazine paper rolled up and put in a weave basket next to the door, the back door, and they would have a stereo, stereo table, excuse me, pushed up away from the door as if I was to break in from that door and didn't know there was a stereo table sitting there and I would push it out of my way as I was opening the door.
"Q Was this then to look like a burglary"
"A Correct."
The appellant advised Harry that, if Mrs. Scott should ask, to tell her that twenty gallons of gasoline would be needed. He also said that when Harry came to start the fire, he would have already soaked gasoline throughout the house. There would be a thirty-gallon garbage can in the living room with one gallon of gasoline remaining in it, and for Harry to pour that gasoline on the three pieces of carpet to be put down on the brick floor in the den. Harry should then take the magazine papers that would be rolled up and located in a basket next to the door, place them end-to-end leading out the door and into the yard, and then light the last piece of paper.
The appellant advised Harry that he would need a driver, someone who would "bring me and drop me off." Evidently, the appellant had previously arranged to have his stepson be the driver for the arsonist, because while Harry was with Mr. and Mrs. Scott, her son called and she began arguing with him on the phone. She was upset because the "son was raising a fit about what he should get out of the deal" (he wanted the washer and dryer for himself and old machinery put in their place), and "because he had got some other stuff before," so she decided she no longer wanted her son involved.
Regarding the appellant's stepson, the appellant and his wife told Harry that they had been previously unsuccessful in burning down their house.
 "They said that they had tried to burn it for insurance purposes at one time and they failed to do it — Well, excuse me. He had his [step]son try to do it and he come in the first evening and tried it and he left and he came back and found out it didn't burn the first time so he approached it again the second evening and tried again and failed. And he came back by the next evening, which was the next day, and tried again and failed."
Because they were not successful in completely burning down their house, they used the insurance money to remodel it.
On Thursday evening, July 8, 1982, the appellant picked up Harry so they could review the procedures, and planned on getting together again the next night.
Harry testified that on Friday evening, he was to drive to the appellant's house and stop on the way and get some boxes. He stated that he did not get any boxes, and upon arrival at the appellant's house, there were boxes packed in the living room and dining room. He also noticed that four guns were missing from the gun cabinet. Harry was told by the appellant that he and Mrs. Scott would be staying at his daughter's, and to start the fire around 2 a.m. Sunday morning. Everything was positioned the way Harry had been told it would be, i.e., the carpets, magazine papers, matches, and stereo table were in place, all except for the gasoline.
Harry testified that that Friday evening he rode with the appellant to Bubba's Service Station, where the appellant pumped some gasoline into a red five-gallon gas can. While there, Harry spoke to his best friend's mother who happened to be there. *Page 1171 
Harry testified that as the scheduled time approached, he began having second thoughts; however, he said, he also thought that if he did not burn down the appellant's house as the appellant planned, the appellant would "come off the bond," thus sending Harry back to jail. Therefore, at 1:45 a.m., Harry drove past the house, checking to see if anyone was around and then parked a block away. He walked to the mail box and, as instructed by the appellant, put in it a note which was written with letters cut from a magazine, saying, "Now, move out, damn you." The purpose of the letter was to make the arson appear to have been done by an "enemy" of the appellant.
Harry entered the back yard and then the house. Again, everything was positioned as had been planned, only this time there was an odor of gasoline present and the thirty-gallon trash can was on the living room floor with the one gallon of gasoline in it. As instructed, he used a one-and-a-half-quart pot in the trash can to pour the remaining gasoline on the three pieces of carpet laid on the brick floor in the den. Harry then laid the papers on the ground leading from the door, except that he used just three pages instead of five as the appellant had instructed. He again hesitated, then lit a page and dropped it. The ground around him immediately caught fire, with the flames extending completely up over his head. Harry's clothes were also on fire. The fire instantly led to the house, which literally exploded. "Well, when it exploded, it just — it looked as if the whole roof went in the sky and all the walls fell." The force of the explosion also threw Harry across a cement slab and against a fence. Fire was everywhere, and in order to escape to the front yard, Harry had to run across a fallen wall that was on fire. He rolled on the front lawn to extinguish the fire on himself, and ran for his parked car. He heard another explosion, looked back and saw flames shooting "at least over 300 feet" in the air.
When he arrived at the apartment of some friends with whom he was staying, he was burned so badly that they did not recognize him. Harry described his burns as being "so bad that there was no skin left on my arms or my face." When his mother first saw him at the hospital she became hysterical, because "he was burnt from the head down to the waist with all his skin, his meat just completely peeled off him."
The conflagration spread to the two neighboring houses. Jeanette Booth lived next door to the appellant. She testified that she was in North Carolina on July 11, 1982, when the fire occurred. When she returned, the end of her house next to the appellant's "had burned away — the outside. The fire had broken through into my bedroom, had burned some of the contents — most of the contents of the bedroom. I had smoke damage throughout the whole house. I had wet carpets, water damage all over. It was a mess." Sue Webb's house was located next to the appellant's on the other side from Ms. Booth's. She was awakened by "a very, very loud noise," and when she looked out her carport door toward the appellant's house, she saw "just solid orange flames, just as high up as I could see standing in the doorway." She ran back inside, awoke her two children and got outside. She immediately looked back and saw that her carport was on fire. She tried to extinguish it with a garden hose, but the heat was too intense.
 A
The appellant contends that his conviction is based on the uncorroborated testimony of an accomplice, Harry Olsen. "A conviction of felony cannot be had on the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the commission of the offense, and such corroborative evidence, if it merely shows the commission of the offense or the circumstances thereof, is not sufficient." Ala. Code (1975) § 12-21-222. As stated by this court in McCoy v.State, 397 So.2d 577 (Ala.Cr.App.), cert. denied, 397 So.2d 589
(Ala. 1981), at 585:
 "The test for determining the sufficiency of the corroborative evidence of *Page 1172 
the testimony of an accomplice is through a `subtraction process.' [Citations omitted.] The test is generally stated:
 `First, the evidence of the accomplice must be eliminated, and then, if upon examination of all other evidence, there is sufficient incriminating evidence tending to connect the defendant with the commission of the offense, there is sufficient corroboration.'" (Citation omitted, emphasis original.)
We must, therefore, review the evidence the State presented by witnesses other than the accomplice, Harry Olsen, prior to the motion to exclude, that tends to connect the appellant with the commission of the arson.
Harry's mother testified that the appellant, a total stranger, offered to post the required bond so that Harry could get out of jail. Upon Harry's release, the appellant told the lady that he would bring Harry home, but first "he wanted to speak to [Harry] about some work that he had for him." The two neighbors testified that the appellant's house had partially burned the year before in August 1981. Mr. Tommy Land, insurance adjuster for Allstate Insurance Company, testified that they had paid the appellant $46,000 on that previous loss. Fire Inspector Charles Butler testified that when he inspected that 1981 fire immediately after it was extinguished, some burned areas were cold while others were still hot. Such evidence corroborated Harry's testimony that the stepson had to reset the fire several times. The insurance adjuster testified that the appellant doubled his insurance coverage after the 1981 fire. He said that his company had paid the appellant over $8,000 in June 1982, the month before the now-concerned July fire, for the claim involving the burning of the appellant's car. He also testified that the insurance company had notified the appellant during that same month that it would not renew the house insurance policy in August. Fire inspector Jack Kiser testified that a flammable liquid had been used in the July fire. He found the presence of gasoline in bedding materials in both bedrooms. He was also of the opinion that at least ten gallons of gasoline would have been required to create an explosion sufficient to cause the extensive damage. Lastly, the appellant's statement given to the fire inspectors makes no reference to buying gasoline or accompanying Harry to a service station, but rather it states that he did not go anywhere with Harry that Friday evening. Mrs. Thelma Warner positively identified the appellant as the man with Harry purchasing gasoline at Bubba's Service Station on Friday night, July 9, 1982, the night before the fire. She also identified the appellant's truck as being similar to the one she saw them getting into at the service station.
We hold that the accomplice's testimony was sufficiently corroborated.
 B
The appellant claims that the testimony regarding the other fires should not have been allowed into evidence, citing Morelandv. State, 373 So.2d 1259, 1261 (Ala.Cr.App. 1979), for the general rule:
 "In the criminal prosecution of a person for the alleged commission of a particular crime, evidence of other acts which of themselves constitute distinct and independent offenses is not admissible."
See also C. Gamble, McElroy's Alabama Evidence, § 69.01 (1) (3d ed. 1977) (hereinafter cited as McElroy's). However, as with every general rule, there are exceptions.
Moreland, supra, also held that for another criminal act to be admissible under an exception to the general rule, there must first be shown a sufficient nexus between the defendant and the other act. See McElroy's § 69.02 (4). This initial requirement was proven with Harry's testimony. The exception is next considered, which in this case clearly falls within the "criminal intent," and the "common plan or scheme" exceptions. McElroy's, §§ 69.01 (5) and (6), respectively.
The appellant also contends that his motion for a mistrial should have been granted *Page 1173 
when Harry testified about how Mrs. Scott's ex-husband had tried to burn down their house. The record is clear that it was not until the jury had heard such testimony that anyone was aware that the incident involved the ex-husband, not the appellant:
"(Bench conference:)
 "MR. HARGETT: One of the things that they discussed before he left the house, one of the things they discussed was the fact that he had tried to burn the house before. We've already had evidence that there was a previous fire at the house, so I'd like to go into that at this time, the fact that they tried to burn the house before.
"THE COURT: Go ahead.
"MR. ALONZO: It's in. Not much I can say about it.
"(Open court:)
 "Q All right, Harry, let me back up just a minute. Before you left the house with Mr. Scott and before you went back to the apartment, while you were there at the house with Mr. and Mrs. Scott, was any mention made of the previous fire they had had?
"A Yes.
"Q What was said about that previous fire?
 "A Well, Mrs. Scott was telling me about how her husband had set a house they had lived in before on fire, which they were both in there asleep at the time, and she showed me how it had been done, which she took me to the water heater in the hallway and explained to me that he had pulled a blanket down through the attic to where it would be close to the flames as [sic] when the heater would ignite for hot water and he had soaked the attic with water — I mean, excuse me — with gasoline to where when the blanket would ignite, it would run up into the attic.
"Q And was that the same house there on Raines Drive?
"A I can't be for sure.
 "Q But she showed you in that house on Raines Drive how he had done it at that time?
"A Yes.
"Q Did she say when that fire occurred?
"A No.
 "Q Did she say whether or not that fire completely destroyed that home or not?
"A No.
 "Q All right. Was that all that was said about that fire?
"A I can't be sure if it was the same evening or not.
 "Q Something was — something else was said about that fire?
 "A Yes, but I can't be for sure it was the same evening.
 "Q All right. Now, was Mr. Scott there when Mrs. Scott was telling you about how Mr. Scott had set this previous fire?
 "A It wasn't Mr. Scott, it was Mrs. Scott's first husband.
"Q Oh, I see. Okay.
 "MR. ALONZO: May we get the jury out of here just a minute or go back into chambers to go into something I just heard?
 "MR. HARGETT: I think I'm confused about something, too. I think we can cure it right here now, Judge.
 "THE COURT: Come up here and do it? "(Bench conference: . . . .)" (R. 107-109)
The trial judge immediately struck such testimony from the record and instructed the jury to "completely eradicate it from your memories and not let it have any play in your deliberations or consideration of the verdict to be rendered in this case." The jurors were then polled. Afterwards, the judge asked defense counsel, "Is there anything further I can instruct them on at this time for you?" Counsel responded, saying, "I think you've done it sufficiently, Judge." Counsel did, however, preserve the record regarding the denial of his motion for mistrial.
It is well established that the ruling on a motion for mistrial is left to the discretion of the trial judge, because he has seen and heard what has occurred and thus is in a better position than an appellate *Page 1174 
court to make a correct ruling on the motion. See cases collected at 6B Alabama Digest, Criminal Law, Key No. 867. The trial court immediately polled the jurors individually and determined that each could and would disregard that testimony, therefore curing any prejudicial error that may have occurred. Kendrick v. State,444 So.2d 905 (Ala.Cr.App. 1984); Wood v. State, 416 So.2d 794
(Ala.Cr.App. 1982). This prompt and thorough action by the trial court creates a prima facie presumption against error. See cases collected in Wadsworth v. State, 439 So.2d 790, 793 (Ala.Cr.App. 1983).
 C
While Harry was in the hospital, he gave a lengthy statement to the fire inspectors pursuant to advice of counsel. The appellant admits that the trial court below made an in camera inspection of that statement in compliance with Ex parte Pate, 415 So.2d 1140
(Ala.), on remand, 415 So.2d 1145 (Ala.Cr.App. 1981). The trial court ruled that the appellant was not entitled to be provided with the statement because the accomplice's trial testimony was not inconsistent with the statement, and the appellant's trial would not be fundamentally unfair if the statement was not provided for inspection. Such ruling is not contested on appeal.
The appellant does contend that he was entitled to inspection because the State used the statement "to impeach testimony of the accomplice and to refresh his recollection." The record is clear that the prior statement was never shown to the witness, even just to refresh his memory, nor was he ever questioned or reminded about his prior statement. In other words, not even the preliminary steps necessary to impeach a witness or refresh his memory occurred.
 II
During a trial recess, one of the jurors, Ms. Miller, saw an individual who was to become a witness. Ms. Miller recognized the individual to be a relative, and brought such fact to the attention of the trial court. During an in camera examination, it was determined that Ms. Miller and the witness, Mr. Nicholas, were first cousins; however, they had not seen each other for fifteen years, and Ms. Miller last saw Mr. Nicholas, whom she knew only as "Booty," when he was a teenager. Ms. Miller stated that she would not give greater weight to his testimony because they were related.
The only ground advanced by the appellant in support of his argument that Ms. Miller should have been excused for cause is §12-16-150 (4), Code of Alabama 1975, which states the general grounds for challenge for cause of jurors. It states that it is a valid challenge for cause of a juror if "he is connected by consanguinity within the ninth degree, or by affinity within the fifth degree . . . either with the defendant or with the prosecutor or the person alleged to be injured." Because Ms. Miller was related to a witness, and not "the defendant or . . . the prosecutor or the person alleged to be injured," the statute fails to support the appellant's motion.
 III
The appellant was sentenced to thirty years on the first degree arson conviction, and ten years on each of the second degree arson convictions, with all sentences to run concurrently.
After the appellant's convictions, but before sentencing, appellant entered into negotiations with the United States Attorney's Office for the Southern District of Alabama. These negotiations were centered around the appellant and his wife assisting that office in investigating and testifying at the trial of one of their pending prosecutions. In exchange for appellant's cooperation, the U.S. Attorney's Office would recommend to the State's sentencing judge that the appellant be sentenced to concurrent ten-year sentences on all three arson convictions. By letter dated March 7, 1984, sent to the appellant's attorney, the U.S. Attorney "confirm[ed] the agreement pertaining to the testimony of [the appellant], to be given at the referenced *Page 1175 
trial." Such letter of confirmation ended with the following paragraph:
 "Of course, should the United States elect not to call John Paul or Lynn Ann Scott to testify before the jury, or the Court rules that it will not allow the testimony of either or both, this agreement is null and void as to the individual(s) not testifying, and no recommendations will be made to the District Attorney as to the individual(s) not allowed or called to testify."
On March 9, 1984, the federal court ruled that the appellant's testimony was inadmissible. Nevertheless, on April 4, 1984, the U.S. Attorney sent a letter to the State's district attorney, advising the latter about the negotiations:
 "The Court ruled that the line of testimony was inadmissible for reasons unrelated to its credibility.
 "Paul Brown, the Scotts' attorney, was made aware on the evening prior to the Court's ruling that the Government would make no specific recommendations to you regarding John Scott's sentence or the disposition of the charges against Lynn Scott if their proposed testimony was rendered inadmissible or the Government decided not to call them. However, we advised Mr. Brown that we would officially make their cooperation known to you. We also advised Mr. Brown that the Scotts would not be prosecuted for possible federal charges arising from their testimony.
". . . .
 "I make this information available to you for your consideration as to what recommendation your office might make and for consideration by the court as to what an appropriate sentence might be. We had confidence in the information given by the Scotts which we corroborated in many ways, and we believe this cooperation is a mitigating factor which should be considered in imposing a sentence. It was from no fault of the Scotts that the testimony was not admitted."
The record is clear that the negotiated recommendation was dependent upon the appellant's testimony being admissible and actually used at trial by the prosecution. Such condition was also clearly known to the appellant. Because that condition was not met, the federal prosecutor was under no obligation to make any recommendations to the State's sentencing judge. Nevertheless, he did, not only by letter, but also via a representative at the appellant's sentencing hearing.
The appellant's reliance on Ex parte Yarber, 437 So.2d 1330
(Ala.), on remand, 437 So.2d 1337 (Ala.Cr.App. 1983), is misplaced. That case involved a sentence recommendation to be made by the prosecution in exchange for a guilty plea. In the instant case, the appellant had already been convicted by a jury. Furthermore, even Yarber, supra, recognizes the fact that the plea agreement is not binding on the judge, and, again, this case was not even a plea agreement.
 IV
The appellant contends that the prosecutor's conduct throughout the proceedings below deprived the appellant of a fundamentally fair trial. He bases this claim on grounds relating to evidence we have hereinbefore ruled to be admissible and/or on correct rulings by the trial court. Therefore, this issue is without merit.
 V
The last issue raised by the appellant is that the damage to the three homes was the result of but a single act, and as such, will support only one conviction. It is without a doubt that the explosion caused the two neighboring dwellings to catch fire and burn. It is also true that if this appellant's act of arson had been committed in almost any other State, the three convictions would stand.
The general rule on this subject is stated at 6A C.J.S. Arson
§ 6 (1975):
 "Likewise, a particular intent to burn or set fire to the specified property, which is the subject of the offense, is not essential, and if the intent is to burn a *Page 1176 
building, and the property, which is the subject of the offense, is burned as consequence [sic] of the accused's acts, the crime is complete although the specified property was not that intended to be burned, since everyone is presumed by law to intend the natural and probable consequences of his acts, and he cannot shield himself from punishment by showing that the consequences differed from his unlawful design. Thus a person who commits arson as to one thing, is generally guilty of arson as to every other thing which takes fire and burns as the natural and probable consequences of his wrongful act, and one, who maliciously and voluntarily sets one dwelling house on fire and the fire spreads to other dwelling houses, is guilty of arson as to all of them."
This general rule has prevailed for many years: J. Bishop, Bishopon Criminal Law § 329 (1882) ("If one attempts to burn the house of a particular individual, but accidentally burns another's . . . or, to defraud the insurance office, light in his own dwelling the flame which communicates unmeant to his neighbor's; he is guilty of arson"); I. Wharton's Criminal Law, § 829 (8th ed. 1980) ("It has, however, been argued that if a man, intending to commit a felony, by accident set fire to another's house, this is arson at common law; and also within the statute; and so if, intending to set fire to the house of A., he accidentally set fire to that of B."); and, H. Smith, Roscoe's Digest of the Lawof Evidence in Criminal Cases, pp. 287-288 (1874) ("If A. has a malicious intent to burn the house of B., and without intending it burns that of C., it is felony. [Citations omitted]. So if A. command B. to burn the house of J.S., and he do so, and the fire burns also another house, the person so commanding is accessory to the burning of the latter house"). This principle of law was also stated nearly 150 years ago in a treatise on criminal law:
 "The term malice, however, in this case as in many others, does not merely imply a design to injure the party who is eventually the sufferer, but an evil and mischievous intention, however general, producing damage to individuals. For it is laid down, that if a man has a design to burn one house, and by accident the flames destroy another, instead of that against which his contrivance was directed, he will be guilty of maliciously burning the latter." III Chitty's Criminal Law § 1122 (1836).
This court has previously reviewed the status of this principle of law in this State. See Hampton v. State, 455 So.2d 149
(Ala.Cr.App. 1984). That case held that a conviction for assault in the third degree was a bar to subsequent prosecutions based on the injuries sustained by other victims of the single shotgun blast. See also Free v. State, 455 So.2d 137 (Ala.Cr.App. 1984) (separate convictions are valid where each individual discharge of a weapon was directed at a different victim, but not where there were multiple victims of a single discharge), and Reeves v.State, 470 So.2d 1374 (Ala.Cr.App. 1985) (automobile accident wherein one person was killed and another injured, the manslaughter conviction is valid but assault in the second degree reversed and rendered).
In Hampton, we recognized that other states hold differently:
 "We are thoroughly convinced that the view that each injury is to be regarded as constituting a separate or distinct offense is sustained by the weight of authority and by the better reason. Berry v. State, 195 Miss. 899, 16 So.2d 629 (1944). However, it is not the law in this state. We respectfully urge our Supreme Court to adopt this view." 455 So.2d at 152.
In fact, most of the other States hold that each separate injury is the basis for a separate conviction, even if both injuries were caused by a single act of the defendant.* *Page 1177 
Three States have recently changed their position from that of this State to the majority view. State v. Irvin, 603 S.W.2d 121
(Tenn. 1980), involved multiple homicides caused in a single traffic accident. The Tennessee Supreme Court overruled a 1929 decision it called the "leading opinion in this State on the subject," by saying that it "was unsoundly based." The court, in reversing its prior position, stated, "We simply are unwilling to approve a rationale, which has elsewhere been generally rejected, that an individual who kills several persons, whether with an automobile, a bomb or a shotgun, can only be convicted of a single homicide. As stated, this is the view held by most modern authorities on the subject." 603 S.W.2d at 123-124.
In State v. McFadden, 320 N.W.2d 608 (Iowa 1982), a case involving multiple convictions for involuntary manslaughter resulting from a traffic accident, the Iowa Supreme Court reversed its position established in 1933, saying:
 "It is clear, however, that today the overwhelming weight of authority recognizes that there are as many separate and distinct offenses as there are deaths resulting from a single incident of vehicular manslaughter. [Citations omitted.]
 ". . . Finally, the [State v.] Wheelock [216 Iowa 1428, 250 N.W. 617 (1933)] once `in line with all the other courts,' now finds scant acceptance. See State v. Irvin, 603 S.W.2d at 121, 124 n. 2." 320 N.W.2d at 618 *Page 1178 
In State v. Myers, 298 S.E.2d 813 (W.Va. 1982), also a vehicular homicide case in which the court reversed its prior position, the court stated, "It is consistent with the goals of our criminal justice system that both society as a whole and the relatives of the victims individually be able to attain some sense of vindication by punishing the appellant separately for each outrageous consequence of his negligent actions." 298 S.E.2d at 816.
Just a few months ago, the Commonwealth of Pennsylvania held that multiple sentences are proper when a defendant's single act injures more than one person. In that case, the defendant, "while fleeing police officers in downtown Philadelphia, drove his car through a crowded intersection and seriously injured nine pedestrians." He was convicted of nine counts of recklessly endangering another person, and was sentenced to consecutive one-year terms of probation. After the intermediate appellate court reversed the multiple sentences (Pennsylvania law allowed multiple convictions but not multiple sentences), the Pennsylvania Supreme Court upheld the multiple sentences, saying:
 "An offender whose unlawful act harms or is likely to harm many people is more culpable, and thus deserving of more severe punishment, than an offender whose unlawful act harms only one person. By holding that multiple sentences may be imposed for a single unlawful act, both purposes are served.
 "Therefore, we hold that the imposition of multiple sentences upon a defendant whose single unlawful act injures multiple victims is legislatively authorized and, consequently, does not violate the double jeopardy clause of the Fifth Amendment[4]. Thus, the trial court did not err in sentencing appellee to one term of probation for each of the nine victims injured by appellee's reckless act.
[4] This holding comports with the view held by a majority of courts in this country. See 7A Am.Jur.2d Automobiles andHighway Traffic § 391 (1980) (`Most courts hold that there are as many separate and distinct offenses as there are persons injured or killed. . . .'). See also Annot., 8 A.L.R.4th 960 (1981) (`many courts apply . . . the view that a single act affecting multiple victims constitutes multiple criminal offenses. . . .')." Commonwealth v. Frisbie, 506 Pa. 461,485 A.2d 1098, 1101 (1984).
Another State, California, in People v. Clark, 252 Cal.App.2d 479,60 Cal.Rptr. 569 (1967), cert. denied, 392 U.S. 944,88 S.Ct. 2301, 20 L.Ed.2d 1407 (1968), summarized the rationale for allowing multiple convictions and multiple punishments:
 "The purpose of the protection against multiple punishment is to insure that the defendant's punishment will be commensurate with his criminal liability. A defendant who commits an act of violence with the intent to harm more than one person or by a means likely to cause harm to several persons is more culpable than a defendant who harms only one person. For example, a defendant who chooses a means of murder that places a planeload of passengers in danger, or results in injury to many persons, is properly subject to greater punishment than a defendant who chooses a means that harms only a single person. This distinction between an act of violence against the person that violates more than one statute and such an act that harms more than one person is well settled. Section 654 is not `. . . applicable where . . . one act has two results each of which is an act of violence against the person of a separate individual.' [Citations omitted.] Thus, in People v. Knowles, supra, 35 Cal.2d 175, 187
[217 P.2d 1], the defendant kidnaped two persons for the purpose of robbing them. The robbery convictions were reversed by reason of Penal Code, section 654, but both kidnaping convictions were affirmed." 252 Cal.App.2d at 482, 60 Cal.Rptr. 569.
Notwithstanding the fact that there are only a few jurisdictions adhering to our position, we have no choice in this matter. We are left to repeat what we said in Hampton, 455 So.2d at 152: "Yet, despite our dissatisfaction with the current state of the law, we are bound by the decisions of our Supreme Court. Alabama Code § 12-3-16 *Page 1179 
(1975). This Court has no authority to declare unsound and overrule cases of the Supreme Court." [Citations omitted.] Therefore, the appellant's conviction for first degree arson is affirmed, and the two second degree arson convictions are reversed and judgment rendered.
AFFIRMED IN PART; REVERSED AND RENDERED IN PART.
All the Judges concur.
* Although this listing is not exhaustive, the following jurisdictions allow multiple convictions and multiple sentences:
Holder v. Fraser, 215 Ark. 67, 219 S.W.2d 625 (1949) (vehicular homicide); People v. Weickert, 191 Colo. 511, 554 P.2d 688
(1976), overruled on other grounds by Villafranca v. People,194 Colo. 472, 573 P.2d 540 (1978) (assault); Murray v. United States,358 A.2d 314 (D.C.App. 1976) (vehicular homicide); State v. Shaw,219 So.2d 49 (Fl.Dist.Ct.App. 1969) (manslaughter of a pregnant woman), and McHugh v. State, 160 Fla. 823, 36 So.2d 786 (1948), cert. denied, 336 U.S. 918, 69 S.Ct. 640, 93 L.Ed. 1081 (1949) (vehicular homicide); Rogers v. State, 163 Ga. App. 641,295 S.E.2d 140 (1982) (vehicular homicide); People v. Allen,368 Ill. 368, 14 N.E.2d 397 (1937), cert. dism'd, 308 U.S. 511,60 S.Ct. 132, 84 L.Ed. 436 (1939) (vehicular homicide); State v.True, 190 N.W.2d 405 (Iowa 1971) (arson; the foreseeable burning of a building); Fleming v. Commonwealth, 284 Ky. 209,144 S.W.2d 220 (1940) (vehicular homicide); State v. McCarroll,337 So.2d 475 (La. 1976) (assault); Commonwealth v. Meehan,14 Mass. App. 1028, 442 N.E.2d 43 (1982) (vehicular homicide);People v. Lovett, 90 Mich. App. 169, 283 N.W.2d 357 (1979) (assault, one bullet injuring two people); State v. Fredlund,200 Minn. 44, 273 N.W. 353 (1937) (vehicular homicide); Berryv. State, 195 Miss. 899, 16 So.2d 629 (1944) (one shotgun discharge injuring two people); Jeppesen v. State, 154 Nev. 765, 49 N.W.2d 611 (1951) (vehicular homicide); Galvan v.State, 98 Nev. 550, 655 P.2d 155 (1982) (vehicular homicide);Hennessey v. People, 21 How.Pr. 239 (1861) (arson of one building that spread to another, conviction for the latter is valid); State v. Nash, 86 N.C. 650 (1882) (one shot injuring two people; recognized the majority view, citing State v.Damon, 2 Tyler 387 (Vt. 1803), "But it is said in a note to Archbold's Criminal Pr. and Pl., 112., to be against the weight and authority and repugnant to reason." 86 N.C. at 652); Statev. Martin, 154 Ohio St. 539, 96 N.E.2d 776 (1951) (vehicular homicide); Fay v. State, 62 Okla. Cr. 350, 71 P.2d 768
(1937) (assault); Giuffrida v. Ashe, 137 Pa. Super. 528,10 A.2d 112 (1939) (arson); State v. Seidschlaw, 304 N.W.2d 102 (S.D. 1981) (vehicular assault); State v. James, 631 P.2d 854 (Utah 1981) (holding five people captive is five kidnapings); Vaughnv. Commonwealth, 4 Va. 273, 2 Va.Cas. 273 (1821) (one shotgun discharge injured two people); State v. Taylor, 185 Wn. 198,52 P.2d 1252 (1936) (vehicular homicide); State v. Rabe,96 Wis.2d 48, 291 N.W.2d 809 (1980) (vehicular homicide); Goodmanv. State, 601 P.2d 178 (Wyo. 1979) (fetus died as a result of shooting mother).
One jurisdiction allows multiple convictions but not multiple punishment:
State v. Mills, 51 N.J. 277, 240 A.2d 1, cert. denied,393 U.S. 832, 89 S.Ct. 105, 21 L.Ed.2d 104 (1968) (multiple deaths during arson of dwelling).
In one jurisdiction, whether multiple convictions and multiple sentences are allowed depends on the intent of the defendant:
Thessen v. State, 508 P.2d 1192 (Alaska 1973) (multiple manslaughter convictions as a result of arson, but only one sentence); State v. Gibson, 543 P.2d 406 (Alaska 1975) (double vehicular homicide, but only one sentence); Cooper v. State,595 P.2d 648 (Alaska 1979) (a single shot toward three people supports three convictions if defendant intended to injure or cause apprehension of all three people; affirmed three ten-year consecutive sentences).
A few jurisdictions, like Alabama, do not allow multiple convictions:
Clem v. State, 42 Ind. 420 (1873) (one bullet injured two people); Ex parte Rathmell, 664 S.W.2d 386 (Tex.App. 13 Dist. 1983) (review granted, pending in Texas Supreme Court) (vehicular homicide); State v. Damon, 2 Tyler 387 (Vt. 1803) (one swing of a knife injured two people).